JOURNAL ENTRY AND OPINION
Plaintiff-appellant Fitzgibbons, Arnold Company Agency, Inc. appeals from the judgment entered by the trial court in favor of defendant-appellee Michael T. Schmutte following a bench trial in plaintiff's contract action for damages resulting from defendant leaving plaintiff's employ and taking a book of insurance business with him. We find merit to the appeal and reverse and remand for the trial court to enter findings of fact and conclusions of law. Civ.R. 52.
Plaintiff Fitzgibbons, Arnold is a corporation in the business of selling various types of insurance to businesses and individuals. On or about February 1992, after a series of negotiations, defendant Schmutte became an insurance salesman employed by Fitzgibbons, Arnold.
The terms of his employment were later memorialized in a memorandum, dated October 15, 1993, from the principals of Fitzgibbons, Arnold to Schmutte. (PX 1). This memorandum was based almost verbatim on Schmutte's handwritten memorandum given to his employer in September 1993. (PX 2). It indicated plaintiff was employed at a base salary of $60,000, plus commissions which increased with his tenure. The agreement also included a provision regarding "Ownership of Book of Business," i.e., a listing of customers (insureds) who purchased insurance through the agency and the commissions associated with premiums paid thereon. The October 15, 1993 memorandum stated in full text as follows:
MEMO
TO: Michael T. Schmutte
 FROM: Dick Arnold Clark Fitzgibbons
DATE: October 15, 1993
SUBJECT: Compensation Plan
Salary and Commission Schedule
1st year 2/92 — 1/93 $60,000
 2nd year 2/93 — 1/94 $60,000 plus 10% of commission paid and received between $50,000 and $85,000 plus 40% of commission over $85,000
 3rd year 2/94 — 1/95 $60,000 plus 25% of commission over $60,000
 4th year 2/95 — 1/96 $60,000 plus 25% of commission earned over $120,000
 5th year 2/96 — 1/97 $60,000 plus 30% of commission over $167,000
 Ownership of Book of Business
• Valuation 1.5 x gross annual commission
• Vesting
1st year = 0
2nd year = 0
3rd year = 10%
4th year = 10%
5th year = 10%
 • At employee option to Buy/Sell from/to Agency
 • Payment of buyout of book to be spread over 2 years
 Teamwork Credits
 • Does not apply to accounts written prior to 9/93.
 • When assistance is given to other producers in landing an account, 25% of new and subsequent renewal commission is credited to Michael T. Schmutte and used in compensation formula.
 • Exception to 25% figure is 33% credit with Fred.
c:mtscomp
The parties dispute is over the meaning of the "Ownership of Book of Business" provision. It is not disputed that the plain meaning of these provisions was that Fitzgibbons, Arnold would own the book of business generated by Schmutte during his employ; that Schmutte would gain an ownership interest (i.e., a vesting) in the book of business at the rate of 10% in each of the third, fourth and fifth year of his employment, or a maximum of 30%. However, the memorandum does not expressly state whether this "vesting" of the 10% ownership interest would occur at the beginning, during or end of the year.
Under this agreement, the book of business was valued at 1.5 times the gross annual commissions received. If Schmutte terminated his employment he was given the option of buying the book of business at the above valuation, less his percentage interest in the book or conversely, he could sell his ownership interest in the book of business to Fitzgibbons, Arnold. The payments for the buy-out of the book would be spread out over two years. The parties agreed to the above terms and operated under them for over four years until Schmutte voluntarily terminated his employment on April 4, 1996. (Tr. at 30, 36)
Schmutte acknowledged that the compensation plan set forth in the October 15th memorandum (PX 1) was based on his own handwritten memorandum of September 1993 (PX 2) and he worked under that plan until his departure on April 4, 1996. When Schmutte left plaintiff's employment, he took a substantial part of the book of business. Specifically, Schmutte took seventeen clients totaling $48,256.78 in gross annual commissions. Plaintiff retained the balance, totaling $41,911.96 in gross annual commissions. (PX 3)
At trial, Schmutte acknowledged that the September 1993 memorandum referencing ownership of the book of business was in his own handwriting setting forth the compensation plan, but he did not recall ever agreeing to anything regarding ownership of the book of business. (Tr. at 125-127). Mr. Fitzgibbons, plaintiff's president, however, recalled the details of the agreement and explained same regarding the book of business. (Tr. at 20-30).
On July 24, 1997, Fitzgibbons, Arnold filed its complaint herein against defendant Schmutte alleging that he breached an agreement with plaintiff causing damages in the approximate amount of $45,334.55.
After a one-day bench trial, on August 3, 1998, the trial court ruled from the bench finding in favor of defendant by holding that although the parties had an agreement, the provisions regarding the buyout of the book of business were too vague to be enforceable.
On August 7, 1998, plaintiff moved the trial court for findings of fact and conclusions of law. On August 27, 1998, the trial court denied the motion, stating that "[t]his Court shall rely on its opinion expressed in open court."
We will address plaintiff's Assignments of Error I, II and III together because they are interrelated.
 I. THE TRIAL COURT ERRED IN FINDING THAT THE CONTRACT WAS UNENFORCEABLE.
 II. THE TRIAL COURT ERRED IN FAILING TO MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW.
 III. THE TRIAL COURT ERRED IN NOT RENDERING JUDGMENT IN FAVOR OF PLAINTIFF IN THE AMOUNT OF $43,075.82, PLUS INTEREST AT THE STATUTORY RATES.
At trial, Schmutte conceded that the October 15th memorandum was an accurate reflection of the salary and commission schedule that was agreed upon in January 1992 when he began his employment with Fitzgibbons, Arnold. (Tr. at 120). Schmutte also acknowledged that the October 15th memorandum accurately reflects the compensation plan that he himself wrote out in a previous handwritten memorandum dated September 1993 (PX 2) in which he set forth his interpretation of the agreed-upon terms of his employment.
This Court in Zab v. Goforth (Sept. 10, 1998), Cuyahoga App. No. 73050, unreported, recently described the essential requirements of a contract:
 "A contract is a promise or a set of promises, the breach of which the law provides a remedy, or the performance of which the law in some way recognizes a duty. Ford v. Tandy Transp. Inc. (1993), 86 Ohio App.3d 364. In order for a party to be bound to a contract, the party must consent to its terms, the contract must be certain and definite, and there must be a meeting of the minds of both parties. Episcopal Retirement Homes, Inc. v. Ohio Dept of Indus. Relations (1991), 61 Ohio St.3d 366, 369." Cleveland Builders Supply Co. v. Farmers Ins. Group of Cos. (1995), 102 Ohio App.3d 708.
We find, as did the trial court, that in January 1992, Schmutte and Fitzgibbons, Arnold agreed on employment including a starting salary, a compensation formula, and a formula for Schmutte to acquire an ownership interest in the book of business. Schmutte began working under those terms and performed under those terms until September 1993. At that point, he proposed a renegotiation of the agreement in his own handwriting. In renegotiating, he reaffirmed the prior agreement and obtained a new provision giving him "teamwork credit," i.e., additional commissions for assisting his co-employees. (PX 1, 2).
Schmutte performed under this contract for two and one-half more years. He admits that Fitzgibbons, Arnold performed its promises under the agreement. The trial court assumed that the memorandum (PX 1, 2) contained the terms that were agreed upon between the parties as to Schmutte's employment (Tr. at 166), and we agree that conclusion was fully supported by the record.
Plaintiff Fitzgibbons, Arnold asserts that Schmutte breached their agreement by refusing to pay for the book of business that he voluntarily took after he terminated his employment with plaintiff. Thus, plaintiff asserts that Schmutte must pay for the value of the book of business he took less his vested percentage interest as set forth in the agreement. The determination of this issue requires an interpretation of the terms of the agreed to compensation plan between the parties.
Courts have an obligation to refrain from rewriting contractual agreements. Miller v. Marrocco (1986), 28 Ohio St.3d 438, 439. However, the interpretation of a written agreement is, in the first instance, a matter of law for the court. Alexander v.Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241. If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. Latina v.Woodpath Development Co. (1991), 57 Ohio St.3d 212, 214; InlandRefuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.
(1984), 15 Ohio St.3d 321, 322. Only when the provisions of the contract are ambiguous should the court submit the matter to the trier of fact, with appropriate instructions, for a resolution of those ambiguities. Clarke v. Hartley (1982), 7 Ohio App.3d 147. An agreement is ambiguous if the court concludes as a matter of law that the parties propose two or more reasonable interpretations. Amdee, Inc. v. Jacobson (Oct. 1, 1987), Cuyahoga App. No. 52800, unreported. The court then determines the most reasonable interpretation of the contract. Id.
Schmutte worked for the company for four years and two months. The agreement, as memorialized in writing, states that Schmutte's interest in the book of business will not vest after the first year or the second year; it will vest 10% each year thereafter up to a high of 30% in the fifth year of his employ.
Since Schmutte did not stay in plaintiff's employ for the whole fifth year, Mr. Fitzgibbons and Mr. Arnold testified that they believed that a pro rata approach is fair and reasonable to adjust the fifth year vesting. (Tr. at 41, 102, 103-4, 109). In other words, because Schmutte left after two months into his fifth year, his vested interest would be 21.67% (10% for year three, 10% for year four, and 1.67% for 1/6 of 10% for year five). There was no testimony that a different approach was intended or that a different approach would be fair and reasonable.
Defendant argues that the buyout agreement was too vague to enforce and the trial court agreed. We disagree. The interpretation of the agreement is a matter of giving effect to the intent of the parties in the language they used to express their mutual understanding. If the business went with Schmutte, he paid for it. If it stayed with Fitzgibbons, Arnold, they would pay Schmutte for his vested interest. That was a basic, inescapable tenet of their arrangement. These parties intended to have an agreement and they acted like they had an agreement. Fitzgibbons, Arnold performed its part of the agreement and they obviously intended the book of business buyout to mean something; it was the court's obligation to find their intent even if it means interpreting the provisions by giving them a reasonable construction.
The court's obligation to give effect to the intent of the parties means sometimes supplying those terms which reasonably carry out what the parties agreed to. As stated in Alligood v.Procter Gamble Co. (1991), 72 Ohio App.3d 309, 311:
 It is basic contract law that to have an enforceable contract, there must be a meeting of the minds of the parties to the contract. Noroski v. Fallet (1982), 2 Ohio St.3d 77, OBR 632, 442 N.E.2d 1302. A valid contract must also be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term. See Mr. Mark Corp. v. Rush, Inc. (1983) 11 Ohio App.3d 167, 11 OBR 259, 464 N.E.2d 586; 18 Ohio Jurisprudence 3d (1980), Contracts, Sections 17 and 140. If it can be determined that the parties intend to be bound, a court may fashion less essential terms that were omitted, in order to reach a fair and just result. Litsinger Sign Co. v. American Sign Co. (1967), 11 Ohio St.2d 1, 40 O.O.2d 30, 227 N.E.2d 609.
In the instant case, defendant cannot claim that the ownership of book of business is unenforceable due to uncertainty simply because the moment of partial vesting in the fifth year is not perfectly clear. The only uncertainty concerns partial vesting of year five: does the 10% vesting for year five occur on the first day of that year, on the last day, or pro rata as each day is completed? The parties obviously intended it to mean something. The courts will determine the meaning of the ambiguous term according to the parties' mutual understanding, the custom, or other established legal principles. As this Court stated in Mr.Mark Corp. v. Rush, Inc. (1983), 11 Ohio App.3d 167, 169:
 When the parties have agreed about issues critical to the transaction, the courts will determine the meaning of ambiguous terms according to the parties' mutual understanding, the custom and practice in the trade or community, or other established legal principles. Cf. Eckenroth v. Dowd-Feder, Inc.
(App. 1941), 35 Ohio Law Abs. 409, at 412; Da Rocha v. Macomber (1953), 330 Mass. 611, 116 N.E.2d 139; Marek v. McHardy (1958), 234 La. 841, 101 So.2d 689.
 Similarly, the courts will supplement the parties' express or implied agreement about those essential elements with other terms implied by custom and practice or consonant legal doctrines. See Litsinger Sign Co. v. American Sign Co. (1967), 11 Ohio St.2d 1, at 14 [40 O.O.2d 30]; Born v. Hammond (1958), 218 Md. 184, 146 A.2d 44.
As these authorities make clear, the court should enforce the agreement by giving meaning to the agreement and providing a term that the parties must have reasonably contemplated.
In this case, the parties agreed to all of the essential terms of employment: salary plus a commission schedule, teamwork credit, valuation of the book of business, vesting, and payment period for the book of business. (Tr. at 121, 124). Defendant admits that the plaintiff Fitzgibbons, Arnold performed its part of the bargain; now when it became defendant's part to stand up to his part of the bargain, his claims that it is too vague and unenforceable are not persuasive.
Defendant Schmutte simply has no recollection of why he inserted the "Ownership of Book of Business" clause in his agreement and testified that he had no knowledge of what "vesting" means in this context. (Tr. at 125-126). The only expository evidence in this case comes from Mr. Arnold and Mr. Fitzgibbons. Both believed that a fair and reasonable interpretation would mean a pro rata vesting, i.e., each day Schmutte was in their employ during the fifth year vesting would increase 1/365th of 10% until the end of the year. (Tr. at 41, 102, 103-104, 109). Mr. Fitzgibbons testified, and such testimony was unrebutted, that the intent of the parties was to give a "fair and reasonable" interpretation to any subject arising that was not directly addressed by the parties. (Tr. at 41). It was error for the trial court to hold that there was no evidence from which it could conclude the intent of the parties.
The trial court was under the obligation to carry out the intentions of the parties that they be bound by the contract:
 If it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result.
Litsinger Sign Co., Inc. v. The American Sign Co. (1967), 11 Ohio St.2d 1,14, 40 O.O.2d 30, 37, citing 1 Corbin on Contracts, 400 to 406, Section 95; 1 Williston on Contracts (3 Ed.), 110 and 111, Section 37. We agree with plaintiff that the trial court was obliged to "fill in the gaps" and give affect to the intention of the parties.
The trial court also recognized that there is "nothing [in the agreement] as to when runoff business is determined * * *." (Tr. at 167). The term "runoff" refers to business accounts that were already coming to an end: "The businesses were no longer going to exist. There was no longer going to be a client that could purchase insurance." (Tr. at 85)
In April 1996, when Schmutte left Fitzgibbons, Arnold, there was $20,250 in commissions that had been part of the book of business, but which was not about to be renewed, through no fault of either party. Accordingly, the figures for the runoff business were not included as a credit for Schmutte or as a debit for which he must pay. They were a "wash," in accounting parlance. Schmutte can hardly dispute the fairness of such a conclusion which results in no benefit or prejudice to either party. Since the $20,250 in business was in "runoff," it was no longer a part of the book of business and no impediment to determining the value of the business taken.
It was therefore error for the trial court to conclude that the agreement was unenforceable because there was no express provision concerning the runoff business. The trial court could have inferred from the context of the agreement and intent of the parties that the book of business did not include non-existent business or business that was not to be carried forward by either of the parties.
Having concluded that the trial court could have given effect to the intention of the parties, in interpreting the Ownership of the Book of Business provision, we will remand the case to the trial court to make the necessary findings of fact and conclusion of law and enter judgment accordingly.
Assignments of Error I and II are sustained. Assignment of Error III is moot and need not be addressed. App.R. 12(A)(1)(c).
Judgment reversed; the case is remanded for further proceedings consistent with this opinion.
It is ordered that appellant recover of appellee its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, J., MICHAEL J. CORRIGAN, J., CONCUR.
 ______________________ JAMES M. PORTER ADMINISTRATIVE JUDGE